After advisement the following opinions were delivered:
By Senator Edwards.
In the case of The Mayor, &c., of New-York v. R. L. & D. N. Lord, 18 Wendell 126, this court permitted D. N. Lord, who held an unexpired term of about five months in the building which was destroyed by fire, under the eighty-first section of the act to reduce the laws relating to the city of New-York into one act, to recover for the value of his goods in the store destroyed, on the ground that he was interested in the building. It is now urged that this section of the act covers still broader ground, and that assessments may be made under it, although the owner or party in interest of the goods destroyed had no interest whatever in the building.
In the decision alluded to, I felt it my duty from the best reflection I could give the case to dissent from the opinion of the majority of the court; and though constrained to yield, I have never felt satisfied with the decision. It has always appeared to me more like legislating for a case the statute *did not embrace, than applying the statute to a [ *161 ] case within the contemplation of the legislature which passed the law. I then insisted that a sound construction of the statute would not embrace a case of damages occasioned to personal property, although the claimant was interested in the building destroyed as tenant of an unexpired term; and although that decision has pronounced the law of the land otherwise, still my opinion of the construction of the statute remains unchanged. The reasons which induced me to come to that conclusion I then stated at length, and it is useless for me here to repeat them. But admitting, as we are now constrained to do, that that decision is the law of the land, in giving a construction to that section of the statute when applied to all similar cases, I am satisfied the court will be cautious how they extend the construction so as to embrace the class of cases now sought to be included.
It appears to me the great error in the construction of this statute, is by blending it with the common law, and imagining that the statute is designed to assist the common law as a remedial statute, in allowing a compensatiofi for the destruction of other property not included within it; and supposing because the legislature embraced one kind of property, they intended also to include another. I apprehend, however, nothing was further from the intention of the legislature, than to aid the common law in including^ the cases now sought to be embraced within its provisions. In my view, they have not designed this statute to aid, or in any manner affect, the common law remedy, except as to the species of property it has designated. If *124 there was a good cause of action, and a remedy provided at common law without the statute for the destruction of all other property under similar circumstances, there is the same remedy with it. The statute nowhere intimates a design to interfere with or to affect it, except when buildings are pulled down or destroyed; and although it has provided a remedy for the destruction of buildings and an interest in them, it has not taken away the common law remedy, and the party may seek his compensation either under the statute or at common law.
[ *162 ] “I think the statute was simply designed to effect only two objects; first, to designate who should be authorized to order the destruction of buildings in case of fire to stop its progress ; and secondly, when done, to provide compensation for the building so destroyer!; that if done by city authority as the statute directed, the city should pay for it—thereby prescribing a remedy ; but it is a remedy to which the party is by no means compelled to resort, if he has a remedy at common law. For in all cases where the statute does not deprive him of the common law remedy, he is left to pursue that course ; but if he elects to pursue his statute remedy for a compensation for the buildings pulled down or destroyed, he cannot afterwards pursue his common law remedy. For the statute declares that the sums assessed by jury shall be paid by the mayor, &c. in full satisfaction oí all demands of such persons respectively, by reason of the pulling down or destroying such building; and there can be but one satisfaction for the same injury. There are many cases in which the maxim, salus populi suprema lex, applies; and I know not but this case may with propriety be considered one of them. Chancellor Kent says, “ the maxim of the law is, that private mischief is to be endured rather than public inconvenience ; and on this ground vests the right of public necessity. If a common highway be out of repair, a passenger may lawfully go through an adjoining private enclosure; so it is lawful to raze a house to the ground to prevent the spreading of a conflagration.” 2 Kent's Comm. 339, citing 1 Dallas' Rep. 363. See also 6 Comyn's Dig. Pleader, 3 M. 30 ; 12 Co. 63 ; and the civil law writers say the individuals who are thus the unhappy subjects of the law of necessity for the safety of the public, may resort to the public for satisfaction of the damages they sustain, Governor, &c. v. Meredith, 4 T. R. 797. But whether there is an ample and complete remedy at the common law or not, is a question unnecessary for us to decide. Suffice it to say the parties have not chosen to put themselves upon that remedy if they have one. They are now prosecuting their claims under a statute law, seeking a statute law remedy ; and the sole question for this [ *163 ] court appears to me to be ^whether they bring their cases within it. If not, they may still resort to the common law for redress if they choose to take that course.
*125 I apprehend that the act which declared it lawful for the major, or in his absence, the recorder of the city, with the consent and concurrence of any two of the aldermen, or for any three of the aldermen, to direct and order any building which they might deem hazardous, or likely to take fire, or to convey the fire to other buildings, to be pulled down or destroyed, gave to these officers no new authority. They undoubtedly had this authority at common law, where the necessity of the case would justify them in exercising it, and the principal object of the law was to designate particular individuals to discharge that duty. This, however, did not prevent other individuals from performing the like duty when the necessity of the case called for it. As this, however, is a proceeding under a statute, we are forced to follow out the statute in applying the remedy it prescribes. Now the property these city officers are by the statute permitted to destroy is clearly named, and admits of no doubt; it is the building on fire, or any other building which they may deem hazardous or likely to take fire, or to convey fire, &c., thus clearly defining their power to destroy, to the building, without permitting them to destroy personal property. The legislature, probably, supposed porsonal property might be removed, and that it would not be necessary to destroy it; but whatever may have been the motive, they have not authorized it to be done. What, then, may we rationally suppose they intended to prescribe the remedy for ? Clearly, for the destruction of the building only, the subject they had by the act designated, which these officers under certain circumstances might destroy. Surely it is not reasonable to believe that the legislature designed they should destroy one thing, and provide a remedy for all other things they should destroy. To my mind, therefore, the intent of the legislature which passed the act is manifest, and does not admit of a doubt. If we can satisfy ourselves of the intent of the legislature in providing this remedy, it ought to settle the question of construction of the statute.
"Rut let us examine the words providing the remedy, and see [ *164 ] whether they will allow of any other rational inference. They are, “ and upon the application of any person interested in such building so pulled down or destroyed, to the mayor or recorder or any two aldermen, it shall be their duty to issue a precept for a jury to inquire of and assess the damages which the owners of such building, and all persons having an estate or interest therein, have respectively sustained by the pulling down or destroying thereof.” Thus it will be perceived that in every single instance where the subject is named or alluded to, it has reference to the building pulled down or destroyed ; and the persons to claim, those owning such building or having an interest in it. No' allusion whatever is made to the goods or personal property. Again: the sums assessed by the jury shall be paid, &c. in full satisfaction of all demands of such persons respectively, by reason of the pulling down of destroying such building. Again: in the *126 eighty-third section, the sum assessed by such jury as aforesaid, for any building so pulled down or destroyed as aforesaid, fo., shall together, &c., . be borne and defrayed by the said mayor, aldermen and commonalty It appears to me, therefore, the expressions made use of by the legislature clearly show their intention to be such as I have before inferred, and indeed I think it is difficult to conceive how they could have selected words more appropriate to show such intention. 1 think, in order to bring the cases now sought to be brought within the provisions of the statute, it is not only necessary to disregard the intention of the legislature, but also the words they have seen fit to use to express that intention. I am for affirming the judgment of the supreme court.
By Senator Paige.
After a careful and attentive consideration of this case, and of the other cases involving the same or similar questions, the conclusion has been forced upon my mind that the decision of the supreme court was correct. The reasons assigned by the chief justice in his opinion for this decision, appear to me unanswerable. And however my sym- [ *165 ] pathies may be excited in favor of the Claimants,' who are exculded by this decision from remuneration for their losses, yet I cannot resist the conviction that they are not, and were not intended to be, embraced within the provisions of the act of the legislature. When these cases were brought before the court at Saratoga, I inclined to concur with the chancellor in the opinion delivered by him on that occasion. But my subsequent examinations have resulted in a clear and undoubting conviction, that the conclusions to which the supreme court arrived,' were warranted by a true construction of the statute and the laws of the state. I agree with the supreme court that the lessee is to be considered owner to the extent of his advances and charges on the goods held on commission, and that no deduction is to be made from the amount of the damages on account of payments received from insurers or remedies against them. The cases are conclusive as to this last point. Yates v. White, 4 Bing. 272, or 33 Com. Law R. 349 ; Maison v. Sainsbury, 2 Marshall on Ins. 794; Randal v. Cochran, 1 Ves. Sen. 98 ; Storrow v. Atlantic Ins. Co. 5. Paige, 293.
The object of the statute being to give to those coming within its provisions a full indemnity, interest was properly allowed to them by the jury.
As the statute only authorizes the damages of the owners of the buildings destroyed, and of those persons who have an estate or interest therein, to be assessed, no allowance can be made under its> provisions, either directly or indirectly, to owners of goods stored in such buildings, or deposited there for sale on commission, such owners having no estate or interest in the buildings. Where the meaning of a statute is plain, no consequences are to be regarded in the construction, for this would be assuming a legislative au *127 thority, Bacon’s Ab. Tit. Statute I. 10. If it is objected to this construction, that the owners of goods, who hold no estate in the buildings, have as equal claims to compensation with those who hold such estate, the answer is, the legislature have thought proper to make a distinction between them, and not to extend to the former the benefits of the act. The legislative will is supreme; to it we must yield implicit obedience. If the constitutional principle, that *private property cannot be taken for ptib- [ *166 ] lie use without just compensation, is, as is contended by the counsel of the claimants, applicable to that class of owners of goods destroyed, who are not provided for by this statute, their remedy is by application to the legislature for the passage of an act providing for their compensation. As they are not embraced within either the meaning or the language of the statute, they were not entitled to have their damages assessed under its provisions.
The question argued by the counsel of the parties in writing remains to be examined,—that is, whether the objections taken to the inquisition and assessment of the jury, in the supreme court, and again urged in this court, can be entertained in this case, it coming before us upon the return to a common law certiorari.
A decision of this question, necessarily leads to an examination of the questions which legitimately arise upon the return to this writ, in the reviewing court. Are these questions confined to such as relate to the jurisdiction of the officer or inferior tribunal before whom the proceedings are had and to the regularity of such proceedings, or do they embrace decisions on the merits, the rulings and opinions of the inferior tribunal, on the trial of the cause ? And perhaps another question is involved in this examination, whether the reviewing court, even if it is not permitted to look into the merits of the case or to review the rulings and opinions of the inferior tribunal, may not notice any question of law which fairly arises on the face of the record or of the proceedings, although such question does not strictly relate to the jurisdiction of the court, or to the regularity of the proceedings.
If the reviewing court is bound to look into the merits, and to examine the rulings and opinions of the inferior tribunal on the trial before it, the evidence and all the decisions upon it must be returned; otherwise not.
At common law all final judgments and adjudications are examinable upon either a writ of error, a writ of false judgment, or a certiorari. Writs of error lie to correct errors in the judgments of a court of record; writs of false judgment to amend errors in a court not of record, but which proceeds ^according to the course of the common law. A [ *167 ] certiorari lies upon all final adjudications of an inferior court or officer, invested by the legislature with power to decide on the property or rights of the citizen, and which court or officer acts in a summary way or in *128 a new course different from the common law. Tidd. Pr. 1051,1138. Coke Lit. 288, b. 2 Salk. 504. 1 Salk. 144,146. 3 Black. Com. 32 to 44. 2 Caine’s R. 182. 20 John. 80.
The writ of false judgment is not applicable here, as we have in this state none of those inferior courts not of record existing in England, which proceed according to the course of the common law.
In this state, the judgments of all inferior courts of record, proceeding according to the course of the common law, are subject - to review in the supreme court upon a writ of error ; and all final adjudications of inferior courts not of record and of persons invested with power to decide on the property or rights of the citizen, who act in a summary way or in a new course, different from the common law are examinable by the supreme court upon a common law certiorari.
A certiorari is defined in Bacon’s Abr., to be a writ issuing out of chancery or the, king’s bench, directed to the judges or officers of inferior courts or tribunals, commanding them to return the records of a cause depending before them. Bacon’s Abr. tit. Certiorari. It may be directed to any inferior court whether it be an ancient or newly created jurisdiction. Bac. Abr. Certio. B. This writ is applied to various uses, other than that of removing final determinations for review, but it is not necessary here to notice them. It, however, never lies to remove a civil proceeding before an inferior magistrate, who has jurisdiction by statute, until after a judgment or final determination therein. Lynde v. Noble, 20 Johns. R. 83.
A common law certiorari, in its office of removing final adjudications for review, possesses all the characteristics of a writ of error. It performs the same office as to inferior summary tribunals, which a writ of error does as to an inferior court of record. And I cannot, upon principle, see why the same results should not follow in the train of a certiorari [ *168 ] *as in that of a writ of error. . A writ of error only brings up the record. It did not reach the merits nor bring up for review the evidence on the trial, and the decisions of the judge there, until the statute gave a bill of exceptions. Stat. of West. 2 Ch. 31, (13 Ed. 1,) Tidd, Pr. 787. People v. Dalton, 15 Wen. 533, 4. 17 Wen. 467. If the analogy then between a certiorari and a writ of error is preserved, the former cannot bring up for review the evidence, and the decisions and rulings of the inferior tribunal thereon; but only the record or the proceedings and orders which are in the nature of a record. In the return of a certiorari the record itself or the tenor of it is to be certified. Bacon’s Abr. tit. Certiorari N. Where there is technically no record, the written proceedings and orders, or a history of the proceedings and the written orders which are in the nature of records are to be certified. And whatsoever is put into the return to a certiorari by way of explanation or other *129 wise, besides what is ordered to be returned, is not to be regarded. Bacon’s Abr. Tit. Certiorari H.
It is apparent to my mind that a common law certiorari, from its analogy to a writ of error does not bring up for review any of the evidence of the trial before the inferior tribunal, or the decisions thereon. This seems to be the settled doctrine in England. In Rex v. Moreley, 2 Burr. 1040, upon a certiorari to remove several orders made by a justice of the peace under the conventicle act, the court of king’s bench .unanimously decided that a certiorari ought" to issue ; and held that “ it did not go to try the merits of the question, but to see whether the limited jurisdiction had exceeded their bounds.” In Loft’s Rep. p. 347-8, a case of certiorari to justices of the peace, Aston J. said “ we never oblige them to return to the certiorari evidence before them, such as affidavits or the like.” The same doctrine was sanctioned in the cases of Rex v. Wakefield, 1 Rurr. 485, and Rex v. St. Andrews Holbourn, 3 Burr. 1458. That the merits are not in question upon the return to a certiorari, and that it does not bring up the evidence, or the rulings of the superior tribunal thereon, appears also from the following cases : The case of Cardiffe Bridge, 1 Salk. 146 ; *1 Ld. Raym. 560 ; 12 Mod. R. 403; 2 Ld. Raym. 580,1 ; [ *169 ] Rex v. Whitbread, 2 Doug. 840; Rex v. Abbot, id. 553. In 1 Barnewell & Adolphus, Anon. 382, the court refused a certiorari to remove a summary conviction by two justices, upon the ground that no excess of jurisdiction appeared on the face of the conviction.
I think it will appear also that in all, or nearly all, the cases in the supreme court where the point was distinctly raised, and passed upon, that the doctrine of the English courts has been followed. In these cases it has with great uniformity been held that upon the return to a common law certiorari, only jurisdictional questions, or questions which relate to the regularity of the proceedings, or questions of law which arise on the face of the record, or of the proceedings and orders, which are in the nature of records, will be noticed. Van Patten v. Ouderkirk, 2 John. Cas. 108; 2 Caines, 179; Nichols v. Williams, 8 Cow. 1; case of Vermilyea, 6 Cow. 555 ; 7 Cow. 121; 6 Wen. 564, 566 ; Rathbun v. Sawyer, 15 Wen. 451; Birdsall v. Phillips, 17 Wen. 466; Simpson v. Rhinelander, 20 Wen. 103. The case of Simpson & Rhinelander, notices the exception to the general rule in the case of convictions under penal statutes where the evidence, which forms part of the conviction, is returned with it and is a subject of review. In 7 Cow. 108,137, & 6 Cow. 355-6, it was held that a writ of error or certiorari did not bring up for review the evidence in criminal cases, as the statute giving a bill of exceptions did not extend to such cases. From the cases cited it appears that a common law certiorari does not bring up the evidence, *130 as it forms no part of the record, and if the return states it, it is to be disregarded.
I am aware that the supreme court have, in some cases, gone into the merits, where the question now discussed was neither raised by counsel or noticed by the court. In my judgment that court pronounced the law correctly in the case of Birdsall v. Phillips, 17 Wen. 464.
I cannot conceive any reason for a distinction between a writ of [ *170 ] error and a common law certiorari. It is conceded that a writ of error could not now bring up the evidence, or the rulings of the Judge on the trial, in either civil or criminal cases, were it not for the statute giving a bill of exceptions. And the statute out of the way, a writ of error would only bring up the record ; and the reviewing court could only examine and correct errors which appear on the face of the record. So in the case of a common law certiorari, there being no statute authorizing a return of the evidence and the decisions thereon, these cannot be returned to or reviewed by the superior court before which the certiorari is returnable. Such court must restrict itself to questions relating to the jurisdiction of the inferior tribunal, the regularity of its proceedings, and to questions of law which may arise on the face of the record or of the proceedings and orders in the nature of records. I assent to the rule deduced by Mr. Justice Cowen from the cases, that “ whenever, were the suit at common law, the matter alleged for error is of such a nature that a bill of exceptions would be essential to its review by writ of error, a certiorari will not reach it, unless some statute has enlarged the effect of that writ in the particular case.” 1 ¿ Wen. 470.
It becomes, then, important to inquire what is proper to be incorporated in the return to a common law certiorari. In Starr v. Trustees of Rochester, 9 Wen. 564-566, Savage C. J. says, that inferior summary jurisdictions are not “ to state facts in the returns, except such as respect their jurisdiction.” In Rathbun v. Sawyer, 15 Wen. 452, Nelson J. says, “the facts or evidence before the (inferior) court are not to be returned, any further than what is necessary to enable the court to determine upon a point of jurisdiction, or other question of law arising in the course of the proceedings.” In Tallman v. Bigelow, 10 Wen. 420, Nelson J. says, “ The power of the superior court to revise and correct the errors of inferior tribunals so far as the jurisdiction of such tribunals is concerned, and the determination of questions of law arising before them, and apparent upon the record or history of the proceedings, has been too often adjudged to admit of question.” In Nichols v. Williams, 8 Cow. 13-16, a case under £ *171 ] the landlord and tenant act, the court refused to ^notice the • charge of the judge and the evidence, and the decision was put *131 upon the mere question of continuance or refusal of the judge to adjourn, which, in 17 Wen. 469, is said by Mr. Justice Oowen to be a mere naked question of jurisdiction.
To apply the principle of these cases to those now under review, let us inquire whether the questions decided by the supreme court were strictly questions of jurisdiction, or questions of law fairly arose on the face of the record. The supreme court have decided that the statute under which the proceedings in these cases were had, does not authorize damages to be assessed in favor of persons not interested in the building destroyed, who had goods stored in such building, or deposited therein for sale on commission, with the owner or lessee thereof, and that such owner or lessee was not entitled to have damages for the losses of such goods assessed in his name. If the supreme court were correct in their construction of the statute, then the inferior tribunal here exceeded their jurisdiction in awarding damages in these cases. By the act, the owners of the buildings pulled down and destroyed, and all persons having an estate or interest therein, are entitled to the damages they sustained by such pulling down and destruction. Ho person not having an interest in such buildings, is embraced within the provisions of the act. The inferior tribunal, therefore, in awarding damages to or for the benefit of persons not having an interest in the buildings, clearly transcended their jurisdiction. It was equally an excess of jurisdiction to allow damages to an owner or a lessee for goods, not covered by the act, as to allow damages to a person having no interest in the building. And this is not merely a case of a wrong rule of damages, or a question as to the amount of damages allowed for a loss provided for by the act; but it is a case of an award of damages for a loss beyond, and not provided for by the act. A plain case of excess of jurisdiction.
The next inquiry is, does this excess of jurisdiction appear on the face of that part of the return which we are at liberty to notice. The return to the certiorari in these cases appears to have been prepared without much regard to form or technical ^accuracy. We have a right [ *172 ] to infer, from the form in which it comes to us, that it was prepared by the mutual consent of all the parties. Otherwise it would not have been left to an affidavit to supply the defects in the return. The affidavit contains a history of many facts and proceedings which would undoubtedly have appeared in a formal return, had not this affidavit, by consent, been substituted for such return. The return is imperfect, and without the affidavit would be defective. It does not contain the petition of the claimants to the mayor, to issue the precept for the jury to assess their damages. The precept of the mayor recites that such petition was presented to him. This petition was a necessary preliminary to the issuing of the precept. It was, or should have been in the nature of a declaration or plaint, and should have *132 shown that the claimants came within the provisions of the act, and sufficient to give the jury and the court of common pleas jurisdiction. 17 Wendell, 467. President of Brooklyn v. Patchin, in error, 8 Wendell, 60 per Chancellor. In the latter case the chancellor, page 60, says, “ When the trustees applied to the judge for a precept, and to the court have the damages assessed, they should, upon the' face of the requisition, have stated sufficient to show that they had authority to lay out the street, and to apply for an assessment of damages.” In the absence of this petition we are authorized to infer that the affidavit contained in the return was substituted, by the consent of the parties, for a more formal return, and we have therefore the right to look into it for the facts which ought to have been set forth in the petition of the claimants, even if we have not the right (which I am inclined to believe we have) to look into it for any facts which bear merely upon the question of jurisdiction. If the proceedings had been regular before the inferior tribunal in this case, every claimant of damages would have presented his petition to the mayor, praying for the issuing of the precept for the jury, or at least he would have presented to the jury, on the taking of the inquisition, his written claim of damages, which petition and written claim should have set forth the necessary facts to bring him within the [ *173 ] provisions of the act. And if the objection now taken had *been taken in the supreme court it might there have been obviated by a further return, bringing up this petition, or written claim, which, under the circumstances, we are bound to presume were presented to the mayor, or jury, and set forth the facts truly, as they appear in the affidavit, and from which it would have appeared that the jury had no jurisdiction to assess damages for the losses sustained by any person not interested in the buildings destroyed.
In my opinion the record of proceedings certified in this return show that the proper tribunal exceeded their jurisdiction, in awarding damages for the loss of goods owned by those claimants who had no estate or interest in the buildings destroyed, and that therefore the judgment of the supreme court ought, in all respects, to be affirmed.
By Senator, Yerplanck.
These cases depend upon the construction of the local statute regulating the destruction of buildings in the city of New York, in cases of inevitable necessity, for the protection of other property from fire, and awarding of damages for such loss. It is therefore important to ascertain the precise principle on which that statute is founded, in order to judge accurately of the spirit and intent in which it should be interpreted, and the degree of latitude that should be given to its language.
There are, I conceive, two different and distinct principles upon which private property may be justly taken, qsed or destroyed for the benefit of oth *133 ers. Both of these are commonly comprehended and confounded in the phrase of “ taking or destroying private property for public benefit.” One of these principles is applied when the property of an individual is taken by the authority of the state for the common use or benefit of the public; that is to say, either for the general use and benefit of the people or state, in its aggregate character, or else of all such of its citizens, without distinction, as may happen to have occasion for the use of such property. Property used or destroyed for the necessities of the common defence in war, lands taken for a canal or a road, are instances of such application. Such, too, in another and secondary form, is the taking of lands by a corporate company *for a railroad, or turnpike, under state authority, where the [ *174 ] company, enjoying a public franchise, so far represents and is a trustee for the public.
All this is done solely by virtue of that right of eminent domain, whereby the whole property of the individuals who compose the state is held subject to the sovereign authority, to be used for the common advantage. It rests, substantially upon the same foundation with the right of taxation. But when the burden of the contribution to the public service falls unequally and oppressively upon an individual, common justice demands that he should receive such remuneration from the state, for whose service his private interests have been sacrificed, as may equalize the burden between him and his fellow citizens. This principle of natural justice has been embodied in o.ur state and national constitutions, in the articles declaring that “ private property shall not be taken for public uses without just compensation.”
But there is also another ground upon which the property or rights of individuals may be justly saerificed.to the necessities of others, where neither the state, as a whole, nor the pub;ic, in the general sense of that term, have any interest in such a sacrifice. This may be seen in cases of imminent peril, when the right of self defence, of the protection of life or of property, authorizes the sacrifice of other and less valuable property. The throwing overboard of goods in a storm, the pulling down of houses to prevent the spreading of a conflagration, are common examples of the exercise of this right. This is a natural right, arising from inevitable and pressing necessity, when two immediate evils, one must be chosen, and the less is voluntarily inflicted in order to avoid the greater. Under such circumstances, the general and natural law of all civilized nations, recognized and ratified by the express decisions of our common law, authorizes the destruction of property by any citizen, without his being subject to any right of recovery against him by the owner. The agent in such destruction, whether in protection of his own rights or of those of others which may be accidentally under his safe-guard, acts from good motives and for a justifiable end ; so that against Mm the sufferer has no rightful claim. But *the [ *175 ] *134 loser may have an equitable right of compensation against those who have benefitted by his loss in the preservation of their property. In marine losses of this nature, the law has been able to establish a just rule of compensation and assessment: and the same principle, so far as it is possible to apply it, would be equally equitable in similar losses by land. But as to most of these, from the impossibility or extreme difficulty of ascertaining the parties benefitted or protected from loss, and of settling the average proportions of the loss amongst them, by any general rule, the sufferer is commonly left without legal remedy. It is a defect in the law, well deserving legislative attention.
Thus, those, who, whether magistrates or private citizens, under the pressure of inevitable danger, and to prevent a greater calamity, find themselves compelled to destroy the effects of others, are not and ought not to be adjudged trespassers, although they do not act for the state or the public, but merely for the service of some few of their neighbors or fellow-citizens, and have thus inflicted involuntary injury upon some to prevent a much greater calamity falling upon others.
These two distinct classes of cases, as I have already observed, are often confounded. Thus we find in the boobs and judicial opinions two leading and often cited cases in Coke’s Reports, spoken of and referred to indiscriminately as establishing the same point. One of them, The saltpetre ease, 12 Coke R. 13, asserts the right of the government, as such to obtain the munitions of war. It is a right of eminent domain, appertaining to the nation, and was held by all the judges to be “ valid, because it was for the defence of the whole realm, in which every subject hath benefitand it was put by them on the same footing as “ when enemies come against the realm to the sea coast, it is lawful to come upon land adjoining to the same to make trenches or bulwarks for defence of the realm, for every subject hath benefit by it.” But it was even in the times of the Tudors and Stuarts, also held, that “ the king’s ministers who dig for saltpetre are bound to leave the inheritance of the subject in so good plight as they [ *176 ] found itand under our constitution, if Compensation for losses sustained by reason of the exercise of this right of eminent domain over private property is not provided for under some previous general law, then legislative relief by special act is a claim of strict right, not an appeal to the bounty or the discretion of the state.
On the other hand another ancient case in the same volume, Mouse’s case, 12 Coke Rep. 62, so often cited or referred to in connection with the last, was a case of private and individual necessity, where, for the safety of passengers, heavy merchandize was thrown overboard from a barge in a storm, and it was held that “ if the danger accrued by the act of God, as by tempest, every one ought to bear his loss for safeguard of the life of *135 man.” Here the right is obviously not that of the state or the public, but of the private citizen acting to the best of his judgment, under the pressure of immediate necessity and the consequent duty thus imposed upon him.
Now this marked and well settled distinction seems to me very important, in reference to the interpretation of the statute under which the present cases arise. That act clearly does not provide for the using private property for the benefit of the state as such, or even for that of the public indiscriminately. It is altogether local and confined in its operation as well as in the responsibility imposed, to the single city of New-York. It prescribes a general though arbitrary rule for providing compensation in certain cases of the voluntary destruction of buildings in order to prevent the destruction of other property, and where it would commonly be exceedingly difficult to ascertain the persons benefitted or protected from injury, and to apportion the loss amongst them. As a general and prospective rule, previous to the occurrence of such a calamity, there can be no injustice in enacting, that the city as a whole, or that to any given extent of neighborhood, should be made liable for such loss. As it is a calamity to which all parts of the city may at different times be subject, the whole city may fairly be made liable by law to contribute whenever it occurs. It is so far a sort of mutual insurance, and all property is held subject to that agreement and responsibility, with all the contingent future benefits of it as well as the burden. *But independently of this prospective undertaking or under- [* 177 ] standing, there can be, so far as I can perceive, no reason of justice why that large portion of the city wholly out of hazard should be called upon to contribute for a past loss of this nature, any more than the rest of the state, or even as much so as any exposed parts of a neighboring county, as in this case, the city of Brooklyn, which was more exposed to the conflagration than many parts of New-York. Where private property is taken for the use of the state, which is therefore responsible for the value, there is always a previous controlling equity in favor of the sufferer, entitling him to relief in some way or other, quite independent of any statutory provision for the valuation and allowance of damages. But, under this act, I cannot see that there is any such equitable claim for indemnity against the city, unless in consequence of previous positive enactment.
The necessity of the case compels the destruction of some property in order to save more; those who commit this act of salutary and well intentioned violence are exempted from responsibility, upon every ground of justice and of positive law. Those for the safety of whose property that of others was sacrificed, are the only persons against whom the sufferers would have any conscientious claim independently of the positive regulation of law. Is there then any controlling equity which can authorize courts to enlarge *136 the natural or fixed meaning of the words imposing the responsibility of damages upon the city ? I think that there is not; and I can add nothing to the reasoning of Judge Bronson, in his opinion, in the former case of R. & D. Lord v. The City of New-York, 17 Wendell, 296, et seq., or to that of the chief justice in this case, to prove that the act speaks only of the damages sustained by the owners or lessees of buildings destroyed in conformity with its provisions.
The only damages given and to be assessed are, in the words of the statute: The damages which the owners of such building and all persons having any estate or interest therein, have respectively sustained by the pulling down or destroying thereof.” Our former decisions have given very great enlargement to that provision, by extending it to in- [ *178 ] elude *all damages incurred by such owners, whether directly by the loss of buildings or consequently by the destruction of their goods, “ by reason of the pulling down or destroying of such buildings.” I can find no sort of authority in the use of language to carry the act farther, so as to extend its benefits (as is now contended) to those whose merchandize has been thus sacrificed, but who have no estate or interest in the buildings destroyed. Mere storage of goods within a building, is neither, in any legal or popular usage, an interest in the building; for an interest in merchandize deposited within a warehouse, and an interest in the warehouse, are very different matters in any sense of words, however popular or -untechnical. I allow willingly that I can perceive no \ sufficient reason of policy, or of fairness in admitting the one class of sufferers to the full benefit of the statute, and wholly excluding the others. Were we acting legislatively on the subject, I should endeavor to place them on the same footing. But that is a matter, of legislative not of judicial discretion, and we must take the statute as it is enacted. Nor can the fact of such goods which belonged to some other person not entitled to claim damages, against the city, being held by one who has such a right, as an agent, make any difference. The claim or privilege of compensation as against the city, is personal to the owner of some estate or interest in the building, or those who claim under him. An interest in that claim may indeed pass by substitution to his own insurers as it may to his assignees; but he cannot, as a mere agent or representative, give to the claim of others the rights peculiarly appertaining to his own personal character. His authority to act for those whom he represents goes, as the chief justice has well distinguished, only to the remedy—to the authority to enforce their rights, not to clothe them with his own. The case of the goods destroyed, the owners of which had no interest in the building, is a case either accidentally or intentionally omitted in the act, and must stand on the ordinary common law ground— that of the right and duty of citizens to preserve the property of many at *137 the expense of that of the few; whilst no distinct provision is made for ascertaining and Collecting the just contributions due [ *179 ] from those for whose use the loss may have been inflicted.
The doctrine of the right and duty of courts to give to statutes an enlarged construction, even in direct contradiction to the language used, but according to the probable or presumed intention of the legislature, has been maintained and applied to this act. There is much and high authority for judicial extension or alteration of the meaning of statutory language, in almost as great a latitude as has been contended for here; and it may be found in express judicial decisions, as well as in the reasonings and opinions of learned judges and commentators. I do not -think it necessary to examine these reasonings and authorities in detail.
The experience of later years has taught courts the danger of excess in bold interpretation, according to the presumed intent, and against the plain language of acts. The ablest and safest judges have borne testimony against the evils of the ancient decisions in this spirit. It is the duty of judges to interpret and apply the provisions of statute law, and not supply their real or supposed defects, or to carry out and apply their presumed policy. Yet, however rigidly courts may adhere to this intention, there will often be necessity for great latitude of interpretation. This arises in no small degree from the necessary imperfection of human language, and the various senses in which words or phrases are used, even by the most careful writers. But legislative language is liable to greater incongruity from the manner in which acts are often framed in numerous bodies, where amendments by one hand are often engrafted upon bills prepared by others, and sometimes with a different intent and spirit. Thus, statutory language may be not only obscure, but contradictory ; and then the necessity of the case imposes on courts the duty of gathering the intention of the legislature as they best can, from the whole legislative expression of their will, taken together and not from single insulated or detached sentences. Still, in my judgment, the general rule must be, that the legitimate power of judicial construction of legislative language beyond or contrary to its customary meaning, is confined to cases of the use of words doubtful or ambiguous in themselves, or Contradictory to other parts of the [ *180 ] same act and its avowed object, or else to some clear and well settled principles of constitutional right, such as the legislature cannot be presumed to have meant to oppugn, or where the act would not have been valid had they so meant. In such cases, and especially the last, the adoption of unusual and even strained senses of words or phrases, has been often resorted to, and this seems justifiable, so long as the construction, though less natural and obvious, is still within some reasonable meaning of the language of the statute. If courts are ever authorized to go beyond these limits, it *138 seems to me that it can only be where there is some acknowledged rule of justice or right wholly independent of the statute, and to which its provisions fail to give full effect.' Where there is such a previous right, for securing and enforcing which no legal remedy has been provided, and where it can be enforced by statutory construction without injustice to other parties, 'such a latitude of interpretation, or rather of application, may be regarded as a strictly judicial act, applying a general principle of justice in a manner pointed out and approved by the legislature as to similar subjects. But when a statute rests upon legislative discretion alone, or judgment upon public policy, then any assumption by courts of varying, abridging, or extending the clear provisions of a statute, upon the ground of carrying out the policy or intention of the enacting body, appears to, me to be a usurpation of power, transgressing the fixed boundaries between the judicial and the legislative authority. Whatever may have been the reason or the excuse, in other countries, or in older times, for such bold construction and alteration of legislative language, with us it is in hostility to the genius and spirit of our republican institutions, which aim at laying open to every citizen, as far as possible, the knowledge of his duty and his rights. The statute book, and the laws of our annual legislation, become, under such" an arbitrary system of interpretation, not merely a sealed book to the private citizen, or the inferior magistrate, but they are calculated to lead into constant error, when the language of the legislature, even where apparently most simple, direct, intelligible. and untechnical, can be construed in a precisely contrary sense as to its legal effect. The rule [ *181 ] *that restricts courts to the interpretation of the statute, and in- ' Mbits them from altering or amending it on any assumed equity or supposed legislative policy, is the true rule of regulated republican liberty, as well as that of reason and justice.
If the statute now under consideration had been literally and strictly intended to provide the mode of compensation by the public for private property taken for the general use, or by individuals for property sacrificed for their benefit, the principle of a right independent of the statute, as just stated,"might, perhaps, apply, and the provisions of this act might be considered as comprehending all property so destroyed, whether within its words or not. But the fact is quite otherwise. Now to impose the burden of past losses, not comprehended in the worns of the statute, upon the wh.ole city, would, in my judgment be, by mere retro-active judicial legislation, to, indemnify meritorious sufferers at the expense of those upon whom they can have no just claim independently of the positive obligation and understanding created by the statute.
The legislature might with perfect justice, if sound policy was thought to require it,, make our towns or counties severally responsible for damages, *139 hereafter arising from robbery within them, or from public tumults, on the principle of the English riot act, or Black act. But certainly there would be no shadow of justice, were the riot act only in force, if courts should, on the assumption of the intention and policy of that statute, extend its construction so as to make the towns liable for losses by robberies, for which the legislature had made no provision.
I think, accordingly, that the statute must be understood as authorizing claims for indemnity against the city, only to the owners or lessees of buildings destroyed by order of magistrates; that although a liberal construction, as given by this court in 1837,18 Wendell, 126, may extend that indemnity to all losses of goods belonging to such owners, or even to their loss of advances or commissions on goods by them, if the jury find that such advances or commissions'have been actually lost, “ by reason of the destruction of buildings,” yet *that goods held by them as mere [ *182 ] agents, or stored in their buildings, are not within the law. To allow the construction contended for on the ground of the equity of the case, requires not merely a bold interpretation of the act, but an absolute interpolation of words not to be found in it, We must read it as if the words “ goods or merchandize” were inserted after the word “ building,” throughout the act. I cannot bring myself to think that any court has the right to make such a large amendment of any legislative provision. I therefore rest my opinion in these cases upon the plain and clear reasons assigned by two of the ablest and most experienced judges of modern times, for their decision on similar questions : “ There is always danger in giving effect to what is called the equity of a statute; and it is much safer and better to rely on and abide by the plain words ; although the legislature might possibly have provided for other cases, had their attention been directed to them.” Per Lord Ch. J. Tenterden, 6 Barn. & Cress. 475. “ We are bound to take the act of parliament as they have made it. A casus omissus can in no case be supplied by a court of law, for that would be to make laws.” Per Buller J. 1 T. R. 52. I regret that the act is thus limited. I have come reluctantly to the conclusion of considering the statute as giving less protection to the foreign or distant merchant than to the owners of warehouses amongst us. It is neither for the honor of the state nor for the commercial advantage of the city, that this should be so; but for myself, I cannot take the responsibility of so bold a judicial enlargement of legislative enactment as is necessary to remedy this evil. I regard it as wrong in itself, and dangerous as a precedent. I lay the more stress on the danger of such a precedent, because similar alterations and interpolations of laws, under the name of interpretation according to equity or intent, have heretofore produced much mischief. They have sometimes frustrated the manifest intention of the legislature, upon the ground of carrying out and explaining its meaning *140 and policy, and they have tended to make our statute hook obscure, perplexed and doubtful, even where its language had seemed to the legislators themselves and to the private citizen, most clear and unambiguous. [ *183 ] *The judgment of the supreme court should be affirmed, in all respects.
Since the argument on the point just considered, additional written arguments have been submitted on the question since raised, “ whether upon the certiorari to the court of common pleas, where the inquisition was taken, as a common law certiorari, the rulings and opinions of that court are subject to be reviewed by the supreme court ?”
These arguments cover the whole ground of the very important and frequently occurring question, how far proceedings in inferior courts can be brought up and reviewed upon a common law certiorari. But I do not. think it necessary for the decision of these causes to inquire whether or not such a certiorari brings up either the whole évidence, or the charge and ruling of the court, or, whether the supervisory authority of the supreme court over inferior jurisdictions in this respect, is confined (as that court has of late years repeatedly decided) to the question of the jurisdiction of the inferior tribunal over the subject of its decision, and to the regularity of its proceedings. Birdsall v. Phillips, 17 Wend. 469. Simpson v. Rhinelander, 20 Wend. 104. The question in the case now before us, as examined and decided by the supreme court, seems to me to be strictly what that court has in its former decisions denominated, a jurisdictional question. The act' under which these proceedings were had, authorizes the jury “ to inquire of and assess the damages which the owners of the buildings, and all other persons having any estate or interest therein have respectively sustained by the pulling down and destroying thereof.” No jurisdiction is given by the act, that confers the whole jurisdiction thus limited, except to assess damages sustained by owners of buildings and persons interested therein. Consequently no jurisdiction is given to inquire into and ascertain the damages sustained by others. If the court below inquired into the damages sustained by others than those mentioned in the act, it exceeded its jurisdiction.
All the evidence necessary to show the limits and exercise of jurisdiction was rightly before the supreme court, and if from that it appears [ *184 ] that the damages were avowedly *assessed for goods deposited on storage or on sale by agents, the question then arises whether the owners of such goods were or were not within the statute ? This seems to me to be a necessary and literal interpretation of the very words of the statute, and it is in harmony with the decisions on the subject of the review upon certiorari, according to the common law, as this confessedly is. I rgfer only to the case of Cardiffe Bridge, 1 Salk. R. 164,1 Ld. Ray *141 mond, 580, which the distinguished counsel for the plaintiff in error has, in his written argument, cited as a leading case, “ declaring the object and office of the writ of certiorari in this respect.” There Ch. Justice Holt laid down the rule thus: “This court will examine the proceedings of all jurisdictions by act of parliament, and if they under pretence of such act proceed to encroach jurisdiction to themselves greater than the act warrants, this court will send a certiorari to have those proceedings returned here ; to the end that this court may see that they keep within their jurisdiction, and if they exceed it, to restrain them ; and the examination of such matters is proper for this court.” In that case, the objection to the orders of the justices returned under the certiorari, was, that the money ordered to be levied was for repairing wears, for which they had no jurisdiction, but only to raise money to repair the bridge; and the court confirmed the orders, because the return showed that the wears were originally made to support the bridge. The court considered the facts of the case rightly and necessarily before them, so far as the jurisdiction of the inferior tribunal of limited authority depended upon such evidence. So here, the act authorizes the assessment of damages sustained by owners of buildings. The objection is that damages have been assessed as sustained by persons, whose losses the act conferred no power to examine or assess. It is not a question of doubtful fact whether such individuals were owners or not. It is a legal question whether or not they were owners within the statute. The interpretation of the statute and the extent of the meaning of the words owner and interest must limit or enlarge the jurisdiction of the court below, as to the persons whose damages may be inquired into. '
^Independently, therefore, of the fact that the present objec- [ *185 J tion to the judgment of the supreme court was never considered and decided in that court, before it was raised here, it seems to me that their decision must be sustained upon any view whatever of the effect of a common law certiorari, as being strictly the right adjudication of a jurisdictional question.
The Chancellor
remarked, in respect to the question of jurisdiction, that in his view of the case of the determinations of the common pleas in respect to the persons entitled to claim damages, and the extent of their claims, had no bearing whatever upon the question of jurisdiction. An erroneous decision of that court, in either of those respects, would not authorize the supreme court to review the case on the ground that the common pleas had exceeded its jurisdiction. The question whether that court had jurisdiction, can be tested only by the proceedings sent up with the return to the certiorari; and if by an inspection of those it appears that an application was made by a person claiming to be interested in a building destroyed, to have his damages *142 assessed, and that a jury were duly summoned and appeared, the common pleas thereby obtained jurisdiction, and did not lose it by any erroneous decision subsequently made. To be enabled to say that the common pleas improperly allowed damages to the individuals who asked for an enquiry into the damages sustained by them, that they allowed damages to an extent not authorized by the act, it becomes necessary to look into the evidence ; and if on finding that the court had erred in either of those particulars, the judgment may be reversed on the ground of want or excess of jurisdiction, then in every case an error of the court upon the facts exhibited before them deprives .them of jurisdiction. This he considered an unsound view of the law, and as, in his opinion, the evidence returned could not be looked into by the supreme court, he thought they had erred in doing so, and that, therefore, the judgment rendered by them should be reversed.
*Senator Maynard
said he was unwilling to pass upon the question of the jurisdiction of the supreme court, or the right of that court to review the decisions of the common pleas in those cases, inasmuch as that question had not been raised in the supreme court. As to the office of a certiorari, he generally agreed in the views of Senator Paige ; but still the point was not free from embarrassment. The English books of reports are full of cases in which upon a common law certiorari to inferior tribunals the evidence is returned, and though the judges say that they will not regard the evidence thus returned, in forming their judgment in the case, they almost invariably look into it and comment upon it.
On the question being put, in the several cases, shalljhis judgment be reversed? three members of the court answered in the affirmative, and fifteen in the negative. Whereupon, the judgment of the supreme court was Affirmed.